UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____9/30/19____

MARIA LUISA BERNABE MORONTA,

         Plaintiff,

-against-

COMMISSIONER OF SOCIAL
SECURITY,

         Defendant.

18-CV-2964 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Maria Luisa Bernabe Moronta filed this action pursuant to § 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (the Commissioner) denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The parties consented to the disposition of this case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Dkt. No. 12) and cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons set forth below, plaintiff's motion (Dkt. No. 20) will be denied, defendant's motion (Dkt. No. 26) will be granted, and the case will be dismissed.

## I.     BACKGROUND

### A.     Procedural Background

On May 27, 2014, plaintiff submitted her applications for DIB and SSI. *See* Administrative Record (Dkt. No. 18) (hereinafter "R. __") at 253-68. In both applications, plaintiff asserted disability as of April 11, 2014, due to lumbar radiculopathy and cervical hernia. (R. 79-81, 89.) Both claims were denied on September 15, 2014. (R. 21, 97.) Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ) (R. 105), after which ALJ Sheila Walters held hearings on July 6, 2016 and May 25, 2017. (R. 38, 52.)

In a written decision dated June 22, 2017 (the Decision), the ALJ determined that plaintiff was not disabled, within the meaning of the Act, from April 11, 2014 to the date of the Decision. (R. 21-32.) On June 29, 2017, plaintiff requested Appeals Council review. (R. 250.) The Appeals Council denied that request on November 7, 2017 (R. 1), making the ALJ's determination final.

### B.    Personal Background

Plaintiff was born on October 11, 1961 and was 52 years old on the alleged onset date of April 11, 2014. (R. 81, 89.) She attended school the through ninth grade. (R. 59.) Her primary language is Spanish (R. 289, 529), and though she reads and writes "some" English (R. 60), she testified before the ALJ through a translator. (R. 21, 54, 57.)

Plaintiff worked as a cashier from 1996 to 2000; a home attendant from 2000 to 2002; a nanny from 2002 to 2006; and again as a home attendant beginning in 2008. (R. 304-08.) In May 2013, plaintiff was injured while tending to a patient in a wheelchair, and began to experience back pain (R. 337, 1108, 1431), but continued working as a home attendant until April 2014. (R. 269, 304.) She has been unemployed since, except for a six-month period in 2015 – after the alleged onset date – during which she cared for a one-year old child. (R. 66.)

According to a Function Report completed on June 11, 2014, plaintiff spent her days making coffee, cooking meals, watching television, and attending appointments. (R. 330.) She was able to take care of her grandchild, "feeding her and mak[ing] sure she's good," and her pet birds. (*Id.*) She wrote that due to pain in her back, legs, and arms, it took her "about 30 minutes to get dressed," and she took a chair into the tub when she showered. (*Id.*) She cooked her own foods, though her daughter helped her do so on the days she was not feeling well. (R. 331-32.) Plaintiff wrote that the only household chore she could do was "dust," and that her daughter assisted her with dusting on occasion. (R. 332.) Plaintiff used public transportation and shopped once a week, but generally did not go out alone. (R. 332-33.)

Plaintiff wrote that since her "condition began" she was "no longer able to sit or lay in one position for too long." (R. 333.) She reported that she could "no longer lift more than 5 pounds" or carry a gallon of milk, could "no longer stand for more than 5 minutes," and could not "sit in one position for more than 20 minutes." (R. 334-35.) She reported that she could not kneel or reach "too high or far." (R. 335.)

Plaintiff did not list any walking limitations in her Function Report. Instead, she wrote that she could walk seven blocks before needing to stop to rest, and that her daily activities included "walking to run errands." (R. 336, 339.) She also wrote that she was able to climb stairs (albeit with breaks), including the stairs to her fourth-floor apartment. (*Id.*)

At the time she completed her Function Report, plaintiff was taking Mapap (acetaminophen) for her pain. (R. 338.)

## II.     THE MEDICAL RECORD

Plaintiff and the Commissioner have each provided a summary of the medical records and opinion evidence in the administrative record. *See* Pl. Mem. (Dkt. No. 21) at 2-8; Def. Mem. (Dkt. No. 27) at 2-13. The Court adopts the parties' summaries for purposes of this action, and highlights only those facts relevant to the Court's decision.

### A.     Treatment Records

#### 1.     2014

On February 27, 2014, before the alleged onset date, an MRI of plaintiff's lumbar spine revealed disc herniation at the L2-L3, L4-L5, and L5-S1 levels, as well as "[n]eural foraminal narrowing seen at the L4-5 and L5-S1 levels," with the "[m]ost significant disease at the left L5-S1 level appearing overall moderate in amount." (R. 1108-09.)

On April 22, 2014, shortly after plaintiff's alleged onset date, she saw internist Ofelia R. Flores, M.D. at the Segundo Ruiz Belvis Diagnostic & Treatment Center of Lincoln Medical and

Mental Health Center (Lincoln Medical). (R. 574.) On examination, plaintiff's back flexion and extension were limited, but she had a "normal motor and sensory exam." (R. 575.) Dr. Flores noted that plaintiff had a "[b]ack pain/disc problem," and wrote that she went to "therapy" and saw an unnamed "orthopedic MD" for that problem. (*Id.*)

### 2. 2015

On January 16, 2015, Dr. Flores saw plaintiff again for a follow-up. (R. 751-52.) Her examination revealed "normal joint range of motion, no effusion, tenderness or deformities" (R. 752), and plaintiff again had a "normal motor and sensory exam." (*Id.*) Dr. Flores noted that plaintiff should come back for a return visit in three months with internist Winifred Egbuna, M.D. (*Id.*)

Dr. Egbuna examined plaintiff on March 26, 2015. (R. 922.) The record contains only the third page of a three-page treatment record on that date. (*Id.*) On examination, plaintiff's extremities had a "normal joint range of motion, no effusion, tenderness or deformities," and her motor and sensory exam was normal. (*Id.*) Plaintiff complained about a "left thumb cyst." (*Id.*)

On July 29, 2015, pain management specialist Robert Kramberg, M.D. of Rehabilitation Medicine Practice of N.Y. (Rehabilitation Medicine) examined plaintiff. (R 863-64.) Plaintiff reported symptoms of "sharp shooting low back pain radiating down to both lower extremities," "difficulty standing for long periods of time," and a need for frequent changes of position "when sitting due to discomfort and pain." (R. 863.) On examination, plaintiff was "was unable to get on and off the exam table without assistance." (*Id.*) Dr. Kramberg observed a "loss of lordosis"; "muscle spasms palpated bilaterally"; "paraspinal tenderness present bilaterally from L1-S1"; and tightness in plaintiff's left and right lumbar areas. (*Id.*) A supine straight leg raise test was positive bilaterally at "20 degrees on the right and 40 degrees on the left." (*Id.*) A neuromuscular examination revealed no evidence of any specific loss of tone or strength, and no evidence of loss

of sensory function "other than those findings listed in the low back exam." (R. 864.) Dr. Kramberg assessed left S1 radiculopathy. (R. 863.) On September 16, 2015, Dr. Kramberg examined plaintiff again, with similar results. (R. 858.)

On September 23, 2015, Jose F. Colon, M.D., also of Rehabilitation Medicine, performed an epidurogram of plaintiff's lumbar spine and a transforaminal epidural steroid injection. (R. 929-31.)[1] The epidurogram revealed "[d]isc herniation at L4-5 with an annular tear contacting the traversing right L5 nerve root, disc herniation at L5-S1 displacing the traversing left S1 nerve root, and left S1 radiculopathy." (R. 930.)

On December 15, 2015, plaintiff returned to Lincoln Medical for a follow up visit with Dr. Egbuna, during which she complained about pain in her knees, particularly the left knee. (R. 874-76.) On examination, plaintiff had crepitus in both knees. (R. 874.)[2] Dr. Egbuna noted that plaintiff had "complete independence in all ADL's self care" (R. 875), and prescribed Tylenol and "rice" (rest, ice, compression, and elevation) for plaintiff's knee pain. She also referred plaintiff to "orthopedic." (*Id*.)

---

[1] An epidurogram is an "x-ray examination that uses injected contrast to provide an outline of compressed nerve roots" which "is sometimes used in the evaluation of back pain." *Epidurogram*, Medical Dictionary, https://medical-dictionary.thefreedictionary.com/epidurogram (last visited September 30, 2019). A transforaminal injection is an injection that targets the "specific nerve root causing" a patient's pain, and generally injects "a mixture of anesthetic (for temporary pain relief) and steroid (for longer term relief)." *Transforaminal Injections*, Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/17572-transforaminal-injections (last visited September 30, 2019).

[2] Crepitus "is the grinding, crackling, or grating sensation in a joint, commonly accompanied by a cracking sound." *Crepitus*, Arthritis-Health, https://www.arthritis-health.com/glossary/crepitus (last visited September 30, 2019). "The joint grinding sensation of crepitus is not a definitive diagnosis of arthritis or joint degeneration, and is only considered significant if it is accompanied by pain or if it affects the joint's mobility." *Id.*

### 3.    2016

#### *a.    Lincoln Medical*

On January 13, 2016, plaintiff presented at Lincoln Medical's Orthopedic Department with left knee pain at a level of 8/10, with "giving way, clicking, and instability." (R. 869.) However, an x-ray of plaintiff's knees showed no evidence of fracture or dislocation. (R. 870, 1246.) The attending physician assessed a "likely meniscal tear" and recommended six weeks of physical therapy to "help strengthen and stabilize the knee." (R. 870*.*)

On March 10, 2016, plaintiff saw physiatrist Peter Kaganowicz, M.D. at Lincoln Medical's Rehabilitation Department. (R. 1064.) Plaintiff reported that her pain was down to 4/10, and Dr. Kaganowicz noted that she ambulated without a cane, that she had a full range of motion, and that her left knee had no swelling. (*Id.*)

On April 28, 2016, plaintiff saw physical therapist Yomaira E. Vanegas. (R. 1261.) Ms. Vanegas noted that plaintiff's pain remained 4/10, that she ambulated without a cane, and that she was "Independent in all Activities of Daily Living [ADL], self-care, & instrumental No gait aid needed." (*Id.*) However, Ms. Vanegas noted that plaintiff "came to PT OPD ambulatory with no device slow and mild limping gait pattern," and gave plaintiff a straight cane. (R. 1263-64.) Plaintiff reported to physical therapy with the cane on May 12 and 19, 2016. (R. 1083, 1085.)

On June 2, 2016, plaintiff returned to Dr. Kaganowicz. (R. 1061.) Dr. Kaganowicz again reported that plaintiff ambulated without a cane, that she had a full range of motion, and that her left knee had no swelling, and noted that plaintiff's pain was down to 3/10. (*Id.*) On June 16, 2016, Ms. Vanegas noted that plaintiff had "[m]odified independent ADL" and was "[a]mbulatory with st cane before but lost cane," and gave plaintiff another straight cane. (R. 1318.) On June 28, 2016, Dr. Egbuna noted that plaintiff "ambulate[d] with a cane." (R. 1371.) On June 28 and July 5, 2016, however, Ms. Vanegas noted that plaintiff presented at physical therapy with a "slow and mild

limiting gait pattern," but no assistive device. (R. 1330, 1336.) On August 13, 2016, plaintiff presented at Lincoln Medical's Emergency Department with back pain, but treatment records reflect that she was "independent with activities of daily living" and had a "normal gait." (R. 1358.)

On September 2, 2016, plaintiff presented to physician assistant Talani Bertram at Lincoln Medical with "left shoulder pain and right wrist pain." (R. 1356.) PA Bertram noted that plaintiff "ambulate[d] without assistance." (*Id.*) On examination, plaintiff had a full range of motion in her upper extremities. (*Id.*) Though plaintiff requested an MRI, PA Bertram discussed with her that it was "not warranted" at that time. (R. 1357.) On October 3, 2016, plaintiff presented to physician assistant Leonel Cruz, at Lincoln Center's Orthopedics Department, with continued shoulder pain. (R. 1352.) X-rays of plaintiff's left shoulder revealed no dislocation or fracture. (R. 1353, 1354.) PA Cruz recommended "conservative treatment" and prescribed meloxicam. (R. 367, 1353.)[3]

### b. *Rehabilitation Medicine*

In 2016, plaintiff began to see pain management specialist Alexandru Burducea, D.O. of Rehabilitation Medicine. On April 5, 2016, plaintiff reported to Dr. Burducea that she had sharp, stiff, throbbing back pain at a level of 10/10, which was "getting worse." (R. 938.) Otherwise, Dr. Burducea reported the same subjective symptoms and objective findings that Dr. Kramberg had reported on September 16, 2015. (*See* R. 858, 938.) He recommended another transforaminal epidural steroid injection. (R. 938.) On May 20, 2016, Dr. Burducea – apparently together with Dr. Colon – performed another lumbar epidurogram and transforaminal epidural steroid injection, with similar results to the procedure on September 23, 2015. (R. 929-30, 940-43.)[4]

---

[3] Meloxicam is a nonsteroidal anti-inflammatory drug (NSAID) which is indicated for relief of the signs and symptoms of osteoarthritis and rheumatoid arthritis. *Mobic*, RxList, https://www.rxlist.com/mobic-drug.htm#description (last visited September 30, 2019).

[4] The record contains separate signed reports describing the May 20, 2016 epidurogram from both Dr. Colon and Dr. Burducea. (*See* R. 940-43.)

On July 20, 2016, Dr. Burducea examined plaintiff again. (R. 1393.) Plaintiff's subjective symptoms and Dr. Burducea's objective findings were generally unchanged from the April 5, 2016 examination. (R. 938, 1393.) Dr. Burducea reported that plaintiff was "still pending authorization for caudal epidural steroid injections" and would follow up after that procedure. (R. 1393.)[5] On October 20, 2016 (having apparently obtained any necessary authorizations), Dr. Burducea performed a caudal epidural steroid injection and radiological interpretation. (R 1397.)

Dr. Burducea next examined plaintiff on November 2, 2016. (R. 1407.) Plaintiff reported "improvement" since her first caudal epidural steroid injection, with her pain "achy, burning, sharp, stiff, [and] throbbing," but down to a level of 6/10. (*Id.*) Dr. Burducea reported objective findings similar to those noted in his prior examinations, except that plaintiff's "[s]upine straight leg raising test was positive bilaterally and limited to 40 degrees on the right and 60 degrees on the left." (*Id.*) On November 21, 2016, Dr. Burducea performed a second caudal epidural steroid injection and radiological interpretation. (R. 1410.)

### c.    *Drs. Khaneja, Denton, and Chiaramonte*

In 2016, plaintiff was also examined by several specialists, including neurologist Amit V. Khaneja, M.D., orthopedic surgeon John R. Denton, M.D., and orthopedic surgeon Gregory Chiaramonte, M.D.[6]

---

[5] A "caudal injection" is "an injection into the lowest portion of the epidural space," which can "help reduce lower back and leg pain caused by sciatica, herniated discs, bone spurs or other back problems." *Caudal Injection*, Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/ 16852-caudal-injection (last visited September 30, 2019).

[6] These physicians' reports are summarized in the Record Review performed by orthopedic surgeon Ronald Mann, M.D. on February 23, 2017 (discussed *infra*), but are not otherwise in the record. (R. 1429-38.) Hearsay medical evidence is generally admissible in SSA proceedings, 20 C.F.R. §§ 404.950(c), 416.1450(c), even where the findings of one doctor appear only in the notations in another doctor's report. *See, e.g.*, *Lena v. Astrue*, 2012 WL 171305, at *9 (D. Conn. Jan. 20, 2012) (citing *Hickey-Haynes v. Barnhart*, 116 F. App'x. 718, 724 n.3 (6th Cir. 2004))

On January 19, 2016, Dr. Khaneja performed a neurological examination of plaintiff, with the impression: "Lumbar spine sprain/strain." (R. 1430.)

On January 20, 2016, Dr. Denton performed an orthopedic examination of plaintiff (R. 1430), who presented with lower back pain. (R. 1433.) Dr. Denton's examination revealed "no muscle spasm upon palpation," normal ranges of motion, and a negative straight leg raise test. (*Id.*) "Neurological examination of the bilateral lower extremities" revealed "no atrophy," "[m]uscle strength in each range [] at +5/5," and "[s]ensation to light touch [] within normal limits." (*Id.*) Dr. Denton's "diagnostic impression included lumbar spine sprain/strain – resolved." (*Id.*)

On May 13, 2016, Dr. Khaneja performed another neurological examination, with the impression: "Cervical spine sprain/strain. Lumbar spine sprain/strain." (R. 1430.)

On June 23, 2016, Dr. Chiaramonte performed an orthopedic examination of plaintiff. (R. 1430, 1435.) "Physical examination of the thoracic spine revealed paraspinal spasm upon palpation." (R. 1435.) However, Dr. Chiaramonte's examination of the lumbar spine "revealed no muscle spasm upon palpation." (*Id.*) Plaintiff had limited flexion in her lumbar spine, but her range of motion was otherwise normal. (*Id.*) "Straight leg raise was negative at 80 degrees (80 degrees normal) bilaterally." (*Id.*) Neurological examination of plaintiff's bilateral lower extremities revealed "no atrophy in the muscles of the right and left thigh or right and left calf," "[m]uscle strength in each range [] at 5/5," and "[s]ensation to light touch [] within normal limits." Dr. Chiaramonte's "diagnostic impression included normal examination of the thoracic spine and lumbar spine sprain/strain – resolved." (*Id.*)

---

(finding no error in the ALJ's "citation to relevant summaries of medical reports contained in" a consultative examiner's report); *Hickey-Haynes*, 116 F. App'x. at 724 n.3 (quoting *Richardson v. Perales*, 402 U.S. 389, 407 (1971)) ("doctors' hearsay opinions should not be excluded unless 'the specter of questionable credibility and veracity is . . . present.'"). Plaintiff has raised no such specter in this case.

### 4.     2017

Plaintiff returned to Dr. Burducea on January 17, 2017. (R. 1415.) She reported that her pain had gotten "progressively worse," and that she had a "decreased quality of life secondary to pain and difficulty of ADLs." (R. 1415-16.) On examination, Dr. Burducea observed decreased lumbar lordosis; paraspinal muscle spasm bilaterally in the L3-S1 area; and "lumbar spine flexion to 40 degrees, extension to 20 degrees, right lateral flexion to 15 degrees, left lateral flexion to 15 degrees, right and left trunk rotation to 20 degrees all with pain at endrange." (R. 1415.) He noted muscle strength of plaintiff's "back extensors and flexors grossly 3-/5"; decreased sensation to light touch; and "[d]ifficulty heel-toe raising." (*Id.*) However, a "[m]otor examination reveal[ed] no evidence of any specific loss of bulk tone, or strength," and a sensory examination "revealed no evidence of loss of sensory function" other than those findings listed in the low back exam. (R. 1415-16.) Dr. Buducea wrote that plaintiff's gait pattern was "antalgic" (limping). (R. 1416.) He concluded that plaintiff had "failed conservative treatment" and was a "good candidate for lumbar decompression discectomy at left L2-3." (*Id.*)

On February 14, 2017, Dr. Burducea examined plaintiff once again. (R. 1419.) Plaintiff reported that she was in "severe pain." (*Id.*) Otherwise, the results of Dr. Burducea's examination paralleled the results of his January 17, 2017 examination. (R. 1419-20.)

There is no evidence in the administrative record that plaintiff was ever prescribed narcotic pain medication.

### B.     Medical Opinion Evidence

The administrative record contains opinion evidence from four medical sources: (1) consultative internist Marilee Mescon, M.D., who examined plaintiff on August 28, 2014, at the request of the SSA; (2) Dr. Egbuna; (3) Dr. Burducea; and (4) non-examining orthopedic surgeon Dr. Mann, who conducted a Record Review on February 23, 2017 in order to make a

recommendation (for workers' compensation purposes) concerning whether plaintiff needed a lumbar discectomy. The record also contains a series of workers' compensation reports from Dr. Burducea, Dr. Colon, and Dr. Kramberg, opining on plaintiff's percentage of temporary impairment.

### 1. Dr. Mescon

Internist Dr. Mescon examined plaintiff on August 28, 2014, for purposes of her application for benefits. (R. 600-03.) Plaintiff complained of back pain, for which she was taking Tylenol, and which she described as 8/10 down to 2/10 with medication. (R. 600.) Plaintiff told Dr. Mescon that she had undergone physical therapy in the past. (*Id.*) She also told Dr. Mescon about an MRI of her back which "showed a herniated disc and a pinched nerve," but did not provide that MRI to Dr. Mescon. (*Id.*) Plaintiff told Dr. Mescon that she could cook, shower, bathe, and dress, but that "family members help[ed] her to clean, do the laundry, and shop." (R. 601.)

The results of Dr. Mescon's examination were entirely normal. Plaintiff was "in no acute distress"; her gait was normal; she could "walk on heels and toes without difficulty"; her squat was full; her stance was normal; she used no assistive devices; and she needed no help changing for the exam or getting on and off exam table. (R. 601.) Both her cervical spine and lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (R. 602.) She had a full range of motion in her shoulders, elbows, forearms, and wrists bilaterally. (*Id.*) Dr. Mescon noted no sensory deficit and 5/5 strength in plaintiff's upper and lower extremities. (*Id.*) She also noted that plaintiff's hand and finger dexterity were intact, and that her grip strength was "5/5 bilaterally." (*Id.*)

Dr. Mescon opined that plaintiff had "no limitations in [her] ability to sit, stand, climb, push, pull, or carry heavy objects." (R. 603.)

### 2. Dr. Egbuna

On June 16, 2016, Dr. Egbuna completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) about plaintiff. (R. 1100-05.) She did not assess plaintiff's ability to lift or carry. (R. 1100.) She opined that plaintiff could sit for four hours without interruption, could stand and walk for one hour each without interruption, and could stand and walk for a total of one hour (each) in the course of an eight-hour workday. (R. 1101.) Dr. Egbuna did not check any box to indicate how long plaintiff could sit over the course of an eight-hour workday. (*Id.*) She opined that plaintiff required a cane to ambulate (adding: "sometimes going for [illegible]"), and that the cane was medically necessary. (*Id.*) She wrote that plaintiff could "never" kneel, crouch, or crawl. (R. 1103.)

Dr. Egbuna checked boxes opining that plaintiff could shop, travel without a companion for assistance, use standing public transportation, prepare a simple meal, care for her personal hygiene, and sort, handle, and use paper files. (R. 1105.) However, she opined that due to her "knee problem" plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces or "climb a few steps at a reasonable pace with the use of a single hand rail." (*Id.*)

Dr. Egbuna did not otherwise assess plaintiff's exertional or postural abilities, and did not opine on plaintiff's environmental tolerance. (R. 1100-04.)

### 3. Dr. Burducea

On June 30, 2016 and March 28, 2017, Dr. Burducea completed Medical Source Statements of Ability to do Work-Related Activities (Physical) about plaintiff.

In his June 30, 2016 Medical Source Statement (prepared just two weeks after Dr. Egbuna filled out a similar form), Dr. Burducea opined that plaintiff could occasionally lift and carry up to ten pounds, but never more. (R. 1093.) He wrote that she could sit, stand, and walk for "15 min" each without interruption, and checked boxes reflecting that she could sit, stand, and walk for a

total of one hour (each) in the course of an eight-hour workday. (R. 1094.) He also opined that plaintiff required a cane to ambulate and that the cane was medically necessary, but that she could ambulate "15 mins" without the use of a cane. (*Id*.) He wrote that plaintiff could "never" reach with her left hand, operate a foot control with either foot, climb ladders or scaffolds, stoop, kneel, crouch, or crawl. (R. 1095-96.) He checked boxes indicating that plaintiff could "travel without a companion," "use standard public transportation," "climb a few steps at a reasonable pace with the use of a single hand rail," "prepare a simple meal," and care for her own personal hygiene. (R. 1098.) However, she could not "perform activities like shopping," "walk a block at a reasonable pace on rough or uneven surfaces," or "sort, handle, or use paper/files." (*Id.*) Moreover, according to Dr. Burducea, plaintiff could not "ambulate without using a wheelchair, walker, or 2 canes or 2 crutches." (*Id.*)[7]

In his March 28, 2017 Medical Source Statement, Dr. Burducea reached slightly different conclusions. He opined that plaintiff could sit, stand, and walk for a total of two hours (each) in an eight-hour workday, writing that for the remaining hours, plaintiff would be "changing positions; sedentary." (R. 1445.) He again opined that plaintiff required a cane, and that the cane was medically necessary, this time writing that plaintiff could walk only "10'-15'" without one. (*Id.*) He wrote that his assessment was supported by an "MRI, objective [illegible]." (*Id.*)

Dr. Burducea opined that plaintiff could "never" reach overhead or push/pull with either hand, or operate foot controls with either foot. (R. 1446.) He also opined that plaintiff could never climb stairs, ramps, ladders, or scaffolds, or kneel or crawl. (R. 1447.) He checked boxes opining that plaintiff could "travel without a companion," "use standard public transportation," and

---

[7] Dr. Burducea did not explain the discrepancy between his conclusion that plaintiff could not ambulate without a wheelchair, walker, two canes, or two crutches, and his conclusion five pages earlier that plaintiff could walk 15 minutes without even a cane. (*Compare* R. 1094 *with* R. 1098.)

"ambulate without using a wheelchair, walker, or 2 canes or 2 crutches," but could not shop, and could not "walk a block at a reasonable pace on rough or uneven surfaces." (R. 1449.) However, he concluded, plaintiff could climb a few steps at a reasonable pace with a cane, prepare simple meals and feed herself "occasionally," and perform "some ADLs." (*Id.*)

### 4. Dr. Mann

On February 23, 2017, Dr. Mann completed a review of plaintiff's records to "address whether there is a need for further treatment" – specifically, a decompression discectomy of plaintiff's lumbar spine (at L2-L3) for which Dr. Burducea had requested authorization from the New York State Workers' Compensation Board on January 19, 2017. (R. 1429, 1437.)

In connection with his Record Review, Dr. Mann went over the results of various diagnostic tests, including the February 27, 2014 MRI of plaintiff's lumbar spine; treatment notes and examination reports from several physicians, including Drs. Kramberg, Colon, Burducea, Khaneja, Denton, and Chiaramonte; and the workers' compensation forms previously completed by Dr. Burducea and Dr. Colon. (R. 1429-31.)

Based on his review of plaintiff's file, Dr Mann recommended against approval of the discectomy. He found that there was "no evidence of nerve impingement at L2-L3 level according to the MRI reports," and concluded that the "proposed surgery would not be expected to provide any anatomical improvements," would "not be expected to be of any clinical value," and that its "risks would outweigh [its] benefits." (R. 1437.)

### 5. Workers' Compensation Opinions

The record also contains several Doctor's Initial Reports from Dr. Burducea, Dr. Colon, and Dr. Kramberg, dated between August 18, 2015 and February 22, 2017, each opining on plaintiff's percentage of temporary impairment for workers' compensation purposes. (*See* R. 860-

62, 865-66, 924-28, 934-37, 1390-92, 1395-96, 1400-02, 1404-06, 1408-09, 1413-14, 1417-18, 1425-46.) These reports generally opined that plaintiff had a "100%" temporary impairment. (*Id.*)

## III.  HEARING TESTIMONY

### A.  July 6, 2016

On July 6, 2016, plaintiff appeared, with counsel, before ALJ Walters. (R. 52.) She testified that she took public transportation to the hearing, accompanied by her daughter and granddaughter. (R. 59.) She stated that her daily activities included bathing, physical therapy appointments, some walking, and cooking, sometimes with the assistance of her daughter. (R. 62.) She stated that she went to church "[s]ometimes," depending on how she felt, but had problems sitting through the service. (*Id.*) Asked about her work history, plaintiff testified that she worked for six months in 2015, taking care of a one-year old child, but did not "pick her up." (R. 66.) As noted above, this was after the alleged onset date of plaintiff's disability.

When asked about her lower back pain, plaintiff testified that she received injections in her back, resulting in her pain being "gone" for "a certain amount of time." (R. 67.) She also testified that she was taking Vimovo for her pain. (R. 68.)[8]

Plaintiff testified that she could walk for twenty minutes at a time and up to forty minutes in an eight-hour day; stand for ten to fifteen minutes at a time and up to forty minutes in an eight-hour day; and sit for fifteen to thirty minutes at a time and up to fifty minutes in an eight-hour day. (R. 69-71.) Asked how much she could lift, plaintiff stated: "I can say 15 pounds, but I have problems. No more than eight." (R. 71.) She testified that she could not lift a gallon of milk. (*Id.*)

---

[8] Vimovo is a combination of naproxen (an NSAID) and esomeprazole magnesium, and is indicated for relief of the signs and symptoms of "osteoarthritis, rheumatoid arthritis and ankylosing spondylitis in adults." *Vimovo*, RxList, https://www.rxlist.com/vimovo-drug.htm (last visited September 30, 2019).

The ALJ then heard testimony from vocational expert (VE) Mary Anderson. VE Anderson testified that plaintiff's most recent prior work was as a babysitter, in 2015, which is a job with a "medium" exertional level, but – based on plaintiff's testimony that she never lifted the child she cared for – that plaintiff performed that job at the "light" level. (R. 73.) The ALJ then presented VE Anderson with a hypothetical claimant:

> Please assume a hypothetical individual of the same age, education and work experience as the Claimant with the following limitations. . . . She is able to lift and carry 10 pounds frequently and 20 pounds occasionally. She is able to sit for six hours of an eight-hour workday. She's able to stand and/or walk for six hours of an eight-hour workday. She is precluded from climbing ladders, ropes and scaffolds. She is limited to occasional . . . climbing of ramps and stairs. She's limited to occasional stooping, kneeling, crouching and crawling and balancing.

(R. 73-74.) VE Anderson testified that such a hypothetical claimant could perform the work of babysitter "as performed only" – *i.e.*, at a light exertional level – and could also perform other light jobs available in the national economy, including "cleaner, housekeeping," "sorter of agricultural produce," and "can filling and clothing machine tenderer." (R. 74-76.)

### B.      May 25, 2017

On May 25, 2017, after receiving additional medical records, ALJ Walters held a supplemental hearing at the request of plaintiff's counsel. (R. 38, 43.) Plaintiff waived her right to appear. (R. 40.) The ALJ presented VE Alan Boroskin with the same hypothetical claimant she had presented to VE Anderson on July 6, 2016. (R. 48.) VE Boroskin testified that such a claimant could perform plaintiff's prior childcare work "that was performed at the light level," as well as other light jobs, including "office helper," "general office machine operator," and "inspector." (R. 49-50.)

## IV. THE ALJ'S DECISION

### A. Standards

A claimant is "disabled," within the meaning of the Act, when she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). In order to determine whether a claimant over the age of 18 is disabled within the meaning of Act, the Commissioner is required to apply a five-step evaluation process pursuant to 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). In order, the steps are:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014); *Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003). If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

Prior to steps four and five, the ALJ must determine the claimant's residual functional capacity (RFC), that is, the "most [a claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's subjective testimony, objective

medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

## B.  Application of Standards

At step one, the ALJ found that plaintiff "engaged in substantial gainful activity after the alleged onset date," during the "bulk" of the six-month period she was babysitting in 2015. (R. 24.) However, given the remainder of "significant unadjudicated periods," the ALJ "defer[red] making a definitive finding at Step 1," and went on "with the sequential evaluation process." (*Id.*)

At step two, the ALJ found that plaintiff had the severe impairments of "degenerative disc disease of the lumbar spine, anemia, and obesity with history of gastric bypass surgery." (R. 24.)

At step three, the ALJ found that plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 26.) She specifically considered Listings "under 1.00 (musculoskeletal system) and 7.00 (hematological disorders)." (*Id.*)

Plaintiff does not challenge the ALJ's determinations at steps one through three.

Before proceeding to step four, the ALJ determined that plaintiff had the RFC "to lift and carry 10 pounds frequently and 20 pounds occasionally; sit for about 6 hours of an 8-hour workday; stand and/or walk about 6 hours in an 8-hour workday; is precluded from climbing ladders, ropes, and scaffolds; is limited to occasionally climbing of ramps and stairs; and is limited to occasional balancing, stooping, kneeling, crouching, and crawling." (R. 27.)

In determining plaintiff's RFC, the ALJ found that plaintiff's "severe impairments can reasonably be expected to cause some functional limitations," but that the "extent of the alleged symptoms and functional restrictions [were] not entirely consistent with the medical evidence and other evidence in the record." (R. 28.) In support of this finding, the ALJ relied on the objective medical evidence, including that plaintiff had "remained neurologically intact, with normal motor

and sensory findings," and that the diagnostic studies in the record revealed only "mild" degenerative osteoarthritic changes in plaintiff's thoraco-lumbar spine, with narrowing of disc spaces, loss of normal lordosis, a left S1 radiculopathy, and disc herniations at L2-3, L4-5, and L5-S1. (*Id.*) She also found that plaintiff's treatment history – including "medications, physical therapy and injections, with the records noting significant clinical improvement following the use of injections" – had been "entirely conservative in nature and essentially isolated to her workers' compensation claim." (*Id.*) She also relied on Dr. Mann's finding of "no evidence of nerve impingement," which "suggest[ed]" to the ALJ that plaintiff's "back condition is not as severe as [she had] alleged" (*id.*), and Dr. Mescon's "objective clinical findings," which were entirely normal, during her August 2014 examination. (R. 29.)

The ALJ found that the record did not support plaintiff's allegations regarding standing and walking difficulties, relying on normal x-rays of plaintiff's knees, Dr. Mescon's observation that plaintiff's gait was "normal," treatment notes from August 2015 and June 2016 reflecting no difficulties with walking and no need for a cane, and treatment notes from July 2016 reflecting that plaintiff's knee pain increased "especially after long walks." (R. 31, 1336.) The ALJ also found that plaintiff's activities of daily living – including her ability to "go to church on Sundays and visit her son once a week," "shower, bathe, and dress"; dust; shop once a week; cook three times a week; take care of her pet birds and grandchild; and use public transportation – did not wholly support her subjective complaints of pain. (R. 31.) The ALJ noted that Dr. Kaganowicz had written in a June 2016 treatment note that plaintiff was "independent in all activities of daily living." (R. 31, 1308.)

The ALJ then weighed the medical opinion evidence. She assigned "little" weight to Dr. Mescon's August 28, 2014 opinion that plaintiff had no functional limitations, because "the record

contain[ed] sufficient diagnostic evidence to support the presence of significantly limiting degenerative disc disease, anemia, and obesity," and because Dr. Mescon "personally examined the claimant only one brief time and did not have the opportunity to review the claimant's medical records." (R. 29.)

The ALJ also accorded "little" weight to the June 30, 2016 and March 28, 2017 opinions of treating physician Dr. Burducea. (R. 30.) She explained: (1) that his opinions were "unsupported and inconsistent with the weight of the medical evidence"; (2) that "the record has generally reflected normal gait without the need for assistive devices," and "[a]ny gait deficits the claimant has had have been entirely fleeting and short-lived"; (3) that "[i]n his medical source statements, Dr. Burducea appears to be an advocate for the claimant and appears to have taken the claimant's subjective allegations at face value when making his assertions regarding claimant's ability to work"; and (4) that Dr. Burducea's opinions were rendered on checkbox forms and include "little analysis or explanation for the extreme limitations rendered." (*Id.*)

She also accorded "little" weight to the June 16, 2016 Medical Source Statement of Dr. Egbuna. (R. 30.) The ALJ observed that, because the signature on that report was "rather illegible," it was unclear "whether the author of the medical source statement is even a medically acceptable source" under 20 C.F.R. §§ 404.1502(a) and 416.902(a). (*Id.*)[9] She stated that "[e]ven assuming that this medical source statement is from a physician who either examined or treated the claimant," her rationale for according its opinions little weight was the same as "set forth for Dr. Burducea's assessments above," including that the "objective record fail[ed] to support a less than sedentary functional capacity" and that the opinions within the Medical Source Statement were "not compatible with the evidence as a whole." (R. 31.)

_____

[9] The Court had no difficulty identifying the signature as Dr. Egbuna's.

The ALJ assigned "considerable" weight to the opinion of Dr. Mann. (R. 30.) She noted that Dr. Mann was a "a board-certified orthopedic surgeon, who reviewed the claimant's workers' compensation records, including Dr. Burducea's treatment notes," and on that basis "rejected Dr. Burducea's request for back surgery due to the lack of evidence concerning nerve root impingement." (*Id.*) The ALJ wrote that Dr. Mann's opinion "strongly suggests that the claimant's back condition is not as severe as alleged." (*Id.*)

Finally, the ALJ accorded "little" weight to the various opinions of Dr. Kramberg, Dr. Colon, and Dr. Burducea, "prepared in the context of the workers' compensation claim system," that plaintiff was unable to return to work or had a 100% temporary impairment. (R. 30.) She did so because (1) "these assessments were made in connection to [sic] the claimant's workers' compensation claim, which defines disability differently" than under the Act; (2) "the final responsibility for deciding issues such as whether or not a claimant is disabled is reserved to the Commissioner"; (3) it was "unclear" to the ALJ if the reports "assess[ed] the claimant's functioning for a 12-month period"; and (4) "the medical professionals who completed these reports did not include complete function-by-function analyses that are reflective of Social Security's disability analysis, nor sufficient clinical or diagnostic findings that would support the purported periods of disability." (*Id.*)

At step four, the ALJ found that the plaintiff was able to perform her past relevant work as a childcare attendant, as she actually performed it. (R. 31-32.) The ALJ then found that plaintiff had "not been under a disability, as defined in the Social Security Act, from April 11, 2014" through the date of the Decision. (R. 32.)

## V.     ANALYSIS

Plaintiff asserts that the ALJ erred in evaluating plaintiff's subjective complaints, "failed to properly weigh" the opinions of Dr. Burducea, Dr. Egbuna, and Dr. Mann, and, as a result, failed

to properly determine plaintiff's RFC. Pl. Mem. at 9-19. The Commissioner argues that the ALJ properly weighed the medical opinion evidence, Def. Mem. at 19-23, and that her evaluation of plaintiff's subjective symptoms and determination of plaintiff's RFC were supported by substantial evidence. *Id*. at 23-25, 16-19.

### A.       Standard of Review

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The reviewing court may set aside a decision of the Commissioner only if it is "based on legal error or if it is not supported by substantial evidence." *Geertgens v. Colvin*, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting *Hahn v. Astrue*, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); *accord Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009). Thus, where an applicant challenges the agency's decision, the district court must first decide whether the Commissioner applied the correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008). If there was no legal error, the court must determine whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at *8.

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson*, 402 U.S. at 401). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than interpretation. "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks and citation

omitted). Thus, if the ALJ's determinations are supported by substantial evidence, "the Court must affirm the decision of the [Commissioner] even if there is also substantial evidence for plaintiff's position." *Gernavage v. Shalala*, 882 F. Supp. 1413, 1417 n.2 (S.D.N.Y. 1995) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)); *accord Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008). The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448; *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). But if the ALJ adequately explains her reasoning, and if her conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision on a *de novo* review. "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted). *See also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("the court should not substitute its judgment for that of the Commissioner").

## B.    The ALJ Did Not Err in Weighing the Medical Opinion Evidence

When evaluating medical opinion evidence to inform a claimant's RFC, an ALJ must generally give more weight to the opinion of a source who has examined a claimant than a source who has not. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1).[10] Similarly, an ALJ must generally give

---

[10] 20 C.F.R. §§ 404.1527 and 416.927 apply to claims – such as this one – which were filed before March 27, 2017.

more weight to the opinion of a source who treated a claimant than a source who did not. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If an ALJ finds a treating source's opinion well-supported by medical findings and not inconsistent with other evidence in the record, the ALJ must give that opinion controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). This rule recognizes that treating physicians are "most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.").

If the ALJ does not assign controlling weight to the opinion of a treating physician, he must give "good reasons" for doing so, and "comprehensively set forth [the] reasons for the weight assigned" to the opinion. *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our . . . decision for the weight we give your treating source's medical opinion."). In particular, the ALJ must consider "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129); *see also* 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), 416.927(c)(2)(i)-(ii) (ALJ must consider length of

treatment relationship, frequency of examination, and how much "knowledge a treating source has about your impairment(s)").

Under this standard, the ALJ may decline to afford the opinion of a treating physician controlling weight where (among other things) "the treating physician issued opinions that are not consistent with other substantial evidence in the record." *Halloran*, 362 F.3d at 32. "When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). *See also* 20 C.F.R. § 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

Only the opinions of treating physicians are entitled to the presumption of controlling weight. However, an ALJ is required to evaluate "every medical opinion" in the record, 20 C.F.R. §§ 404.1527(c), 416.927(c), and, for each such opinion, must consider whether it is supported by "relevant evidence" and "supporting explanations," whether it is consistent "with the record as a whole," and whether the source who provided it is a specialist in the relevant field. 20 C.F.R. §§ 404.1527(c)(3)-(5), 416.927(c)(3)-(5).

In this case, as noted above, plaintiff challenges the weight accorded to the opinions of three medical sources: Dr. Burducea, Dr. Egbuna, and Dr. Mann. Generally speaking, plaintiff argues that the ALJ should have given controlling weight to Dr. Burducea's opinions, *see* Pl. Mem. at 13, more weight to Dr. Egbuna's opinions, *see id.* at 14, and no weight to the views of Dr. Mann, who "gave no opinion on Plaintiff's functional capacity." *Id.* at 15.

### 1. The ALJ Did Not Err in Weighing Dr. Burducea's Opinions

The ALJ acknowledged that Dr. Burducea was plaintiff's treating physician (R. 30), but rejected several of his conclusions, including that plaintiff could only lift and carry up to ten

pounds occasionally; could sit, stand, and walk for only fifteen minutes without interruption, and only one-to-two hours (each) in an eight-hour workday; and could never reach overhead, climb stairs or ramps, stoop, or crouch. (R. 1093-98, 1444-49.) As explained below, the ALJ provided good reasons for according Dr. Burducea's opinions "little" weight.

First, the ALJ did not err in concluding that Dr. Burducea's opinions were "unsupported and inconsistent with the weight of the medical evidence." (R. 30.) While the objective medical evidence relied on by Dr. Burducea – plaintiff's February 2014 MRI – revealed disc herniations at various levels, it revealed "no evidence of nerve impingement" at L2-L3, where Dr. Burducea had recommended surgery. (R. 1108, 1436.)[11] Moreover, as the ALJ noted, the record "has generally reflected" that plaintiff ambulated with a "normal gait" and "without the need for assistive device." (R. 30.) Indeed, in June 2016 (the same month that Dr. Burducea completed his first Medical Source Statement), plaintiff presented at Lincoln Medical twice without a cane (R. 1061, 1350) and at times with a "normal gait." (R. 1061; *see also* R. 1254, 1358.) When she did present with a limping gait pattern, it was "mild." (R. 1321, 1327.) While there is also evidence from the same period that plaintiff's physical therapist gave her a straight cane (R. 1263-64, 1318), such evidentiary conflicts are for the ALJ to resolve. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

Moreover, Dr. Burducea's opinions were inconsistent internally, and with one another, on the same point. *See Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) ("A physician's opinions are given less weight when his opinions are internally inconsistent."). For example, he opined in

---

[11] Moreover, as the Commissioner points out, that MRI was conducted while plaintiff was still working – and a full year before her six-month stint working as a babysitter in 2015 (R. 66, 304) – suggesting that the conditions revealed by it did not, without more, prohibit plaintiff from working.

June 2016 that plaintiff could ambulate for 15 minutes without a cane, that she "require[d] the use of a cane to ambulate," *and* that she could not ambulate "without using a wheelchair, walker, or 2 canes or 2 crutches" – all in the same Medical Source Statement. (R. 1094, 1098.) His next Medical Source Statement, in March 2017, did not assert that plaintiff needed a wheelchair, walker, two canes, or two crutches (R. 1449), but opined that plaintiff could not walk without a cane more than ten to fifteen feet. (R. 1445.) Similarly, Dr. Burducea's second Medical Source Statement doubled the length of time he believed plaintiff could walk, sit, and stand in an eight-hour workday (from one hour each in his 2016 statement to two hours each in his 2017 statement), without any explanation. (R. 1094, 1445.) Both opinions were, in turn, inconsistent with those of the other medical sources in the record, including Dr. Egbuna, who opined – two weeks before Dr. Burducea's first Medical Source Statement – that plaintiff could sit for four hours without interruption. (R. 1101.)[12] Given such inconsistencies in the record, the ALJ committed no error in finding that Dr. Burducea's opinions were "unsupported and inconsistent with the weight of the medical evidence." (R. 30.)

The ALJ was also entitled to discount Dr. Burducea's opinions on the ground that he "appear[ed] to be an advocate for the claimant and appear[ed] to have taken [her] subjective allegations at face value," and because he provided his opinions in "checkbox forms" with "little

_____

[12] Dr. Burducea's opinions were also based on objective findings which were inconsistent with the objective findings of other physicians during the same period. For example, Dr. Burducea's April 5, 2016 and July 20, 2016 treatment notes report that plaintiff had "muscle spasms palpated bilaterally" in her lower back, that there was "paraspinal tenderness present bilaterally from L1-S1," and that a supine straight leg raise test was "positive bilaterally." (R. 938, 1393.) However, Dr. Denton's January 20, 2016 examination of plaintiff's lower back revealed "no muscle spasm upon palpation," "no complaint of tenderness upon palpation," and a negative straight leg test. (R. 1433.) Similarly, Dr. Chairamonte's June 23, 2016 examination of plaintiff's lumbar spine revealed "no muscle spasm upon palpation," "no complaint of tenderness upon palpation," and a negative straight leg test. (R. 1435.)

analysis or explanation." (R. 30.) As the ALJ noted, Dr. Burducea provided almost no narrative on his Medical Source Statements. (R. 1093-98, 1444-49.) *See Aarons v. Colvin*, 2015 WL 5000843, at *12 (S.D.N.Y. Aug. 21, 2015) (upholding ALJ's weighing of a treating physician's opinion where the record did not support his "check-the-box" style questionnaire). Moreover, in Dr. Burducea's treatment notes dated January 17, 2017 and February 14, 2017, he expressly advocated for plaintiff's candidacy for lumbar decompression discectomy, apparently adopting her subjective allegations that her pain was "agonizing" and "severe," and that she had suffered from it "since being injured at work on 05/23/2013," notwithstanding that Dr. Burducea did not begin to treat plaintiff until 2016. (R. 1415-16, 1419-20.) *See Lewis v. Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013) (upholding ALJ's decision to discount the opinion of a treating physician where his "final opinion was inconsistent with his own prior opinions and the findings of the other medical examiners, and was based on [the claimant's] subjective complaints").[13]

To be sure, the ALJ did not explicitly address every factor listed in 20 C.F.R. §§ 404.1527(c), 416.927(c) and discussed in *Selian*, 708 F.3d at 418. She did not, for example, expressly discuss the "length of the treatment relationship and the frequency of examination" by Dr. Burducea. *Id.*[14] It is clear from the record, however, that the ALJ reviewed multiple treating notes and opinions from Dr. Burducea and was aware of the extent of his physician-patient relationship with plaintiff. Moreover, a detailed discussion of each regulatory factor is not

---

[13] The Commissioner offers another reason to question Dr. Burducea's opinion: that "Dr. Burducea's April, July and September, 2016, clinical findings were identical to each other, and identical to Dr. Kramberg's July and September, 2015 findings," and that his "January and February 2017 'objective' findings were identical." Def. Mem. at 21; (*see also* R. 858-59, 863, 938-39, 1393, 1415-16, 1419-20.) It is true that Dr. Burducea's clinical findings were suspiciously uniform. However, the Court concludes that the ALJ had a sufficient basis to discount Dr. Burducea's opinion without reaching this issue.

[14] The Commissioner notes, for example, that Dr. Burducea treated plaintiff only once or twice before completing his June 2016 Medical Source Statement. Def. Mem. at 6. (*See also* R. 938-39.)

required, so long as the ALJ provides "'good reasons' for the weight she gives to the treating source's opinion." *Halloran,* 362 F.3d at 32-33 (quoting *Schaal,* 134 F.3d at 505). *See also Atwater v. Astrue,* 512 F. App'x 67, 70 (2d Cir. 2013) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."); *Gabrielsen v. Colvin,* 2015 WL 4597548, at *8 (S.D.N.Y. July 30, 2015) ("a recitation of every factor of the treating physician rule is unnecessary; the ALJ need not explicitly consider each factor of the treating physician rule, but rather must only follow its mandate more generally"). The Court therefore concludes that the ALJ provided "good reasons," and an adequate roadmap, for her decision to accord only "little" weight to the opinions of Dr. Burducea.

### 2. The ALJ Did Not Err in Weighing Dr. Egbuna's Opinion

The same is true for the ALJ's decision to accord "little" weight to Dr. Egbuna's June 16, 2016 Medical Source Statement. As noted above, the ALJ did not identify Dr. Egbuna as the author of that statement, but nonetheless assumed, correctly, that it was "from a physician who either examined or treated the claimant." (R. 31.) She then discounted the opinion primarily because "the objective record fail[ed] to support" the "less than sedentary functional capacity" Dr. Egbuna's opinions suggested. (*Id*.) This was not error.

Although Dr. Egbuna had treated plaintiff, her treatment relationship with plaintiff was brief, calling into question her status as a "treating source" for purposes of 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). *Id.* ("Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)."). The record reflects that Dr. Egbuna treated plaintiff only twice in the 15 months before she completed her Medical Source Statement – once on March 22, 2015 and once on December 15, 2015. (R. 874-

75, 922.) Such a sparse treatment history is generally insufficient to entitle a physician to the controlling weight afforded a "treating source" under the regulations. *See Mongeur*, 722 F.2d at 1039 n.2 (opinion of physician "who only examined Mongeur once or twice" was not "entitled to the extra weight of that of a 'treating physician'").

Second, as the Commissioner notes, "Dr. Egbuna's opinion is not supported by [her] clinical findings or by the evidence as a whole." Def. Mem. at 22-23. During plaintiff's March 15, 2015 visit with Dr. Egbuna, she apparently complained only about a left thumb cyst (later successfully treated, *see* R. 1201-03). (R. 922.) Her physical exam revealed "normal" ranges of motion in the joints and no effusion, tenderness, or deformities, and she had a "normal motor and sensory exam." (*Id.*)

During her December 15, 2015 visit with Dr. Egbuna, plaintiff complained of pain in her knees (particularly the left), but reported that she obtained "some relief" with Motrin and denied other "Muscle/Joint/Bone" problems. (R. 874.) Dr. Egbuna observed crepitus in plaintiff's knees, but noted that she had "complete independence in all ADL's self care." (R. 874-75.) At the end of that visit Dr. Egbuna referred plaintiff to "orthopedic" and prescribed Tylenol and "rice" (rest, ice, compression, elevation) for her knee pain. (R. 875.) Thereafter, on January 13, 2016, an x-ray of plaintiff's knees yielded entirely normal results (R. 1246), and plaintiff was prescribed "[c]onservative treatment," consisting of six weeks of physical therapy. (R. 1247-48.) By June 2, 2016 – plaintiff's last visit to Dr. Kaganowicz in Lincoln Medical's Rehabilitation Department before Dr. Egbuna signed her Medical Source Statement – plaintiff's pain was down to 3/10, she was ambulating without a cane, and she had a full range of motion and no swelling in her left knee. (R. 1061.) Nothing in these notes appears to support Dr. Egbuna's opinion, rendered on June 16,

2016, that plaintiff could only stand or walk for one hour total (each) in an eight-hour workday, nor her opinion that plaintiff could not sit for more than four hours at a time. (R 1101.)

I note as well that plaintiff does not challenge the ALJ's determination, at step two, that plaintiff's knee condition was not a severe impairment. (R. 24.) On these facts, the Court finds no error in the weight accorded Dr. Egbuna's June 16, 2016 Medical Source Statement.

### 3. The ALJ Erred in According the Opinion of Dr. Mann Considerable Weight, but That Error Was Harmless

The ALJ's treatment of Dr. Mann presents a closer question. As detailed above, ALJ Walters accorded "considerable" weight to the opinion of Dr. Mann, who neither treated nor examined plaintiff:

> Notably, Dr. Mann, a board-certified orthopedic surgeon, who reviewed the claimant's workers' compensation records, including Dr. Burducea's treatment notes, rejected Dr. Burducea's request for back surgery due to the lack of evidence concerning nerve root impingement. Dr. Mann's opinion is accorded considerable weight as it strongly suggests that the claimant's back condition is not as severe as alleged. As a board-certified orthopedic surgeon, Dr. Mann has the relevant education, background, and training to assess this particular claimant's impairments. Further, he provided extensive summaries following his review of the claimant's records, including her MRI reports.

(R. 30) (record citations omitted).

"In the right circumstances," "[t]he opinion of a non-examining medical consultant can constitute substantial evidence in support of the ALJ's findings" and "may even override the opinions of treating physicians." *See Reid v. Berryhill*, 2018 WL 8545835, at *13 (S.D.N.Y. Dec. 20, 2018) (citing *Fyre ex rel. A.O. v. Astrue*, 485 F. App'x. 484, 487-88 (2d Cir. 2012)), *report and recommendation adopted*, 2019 WL 1284275 (S.D.N.Y. Mar. 20, 2019). However, this case does not present such circumstances. Dr. Mann provided only one opinion about plaintiff: that lumbar decompression surgery at L2-L3, proposed by Dr. Burducea, "would not be expected to provide any anatomical improvements" and that the risks of such a surgery "would outweigh the

benefits." (R. 1437.) He did not otherwise opine on plaintiff's condition, did not assess her pain or degree of disability, and did not offer any views concerning the limitations, if any, on plaintiff's ability to work. Nonetheless, the ALJ appears to have accorded Dr. Mann's opinion "considerable" weight for the broad proposition "that the claimant's back condition is not as severe as alleged." (R. 30.) Such an opinion appears nowhere in Dr. Mann's Record Review, and cannot reasonably be inferred from anything he did say.[15]

Nonetheless, the Court finds that the ALJ's error in according "considerable" weight to the opinion of Dr. Mann was harmless, because the ALJ did not rely on any limitations identified (or rejected) by Dr. Mann to inform her RFC determination, and because there was substantial evidence in the record to support her evaluation of plaintiff's reported symptoms. *See Davis v. Callahan*, 1997 WL 438772, at *12 (S.D.N.Y. Aug. 4, 1997) (finding the ALJ's error in not explaining the weight afforded to non-examining physicians' opinion harmless because "whether or not the ALJ gave this opinion evidence weight, the result would be the same," given that "the limitations in issue do not affect Plaintiff's ability to perform sedentary work"), *aff'd sub nom. Davis v. Apfel*, 145 F.3d 572 (2d Cir. 1998). Indeed, notwithstanding the ALJ's somewhat careless language, it appears that she relied on Dr. Mann's Record Review primarily for its helpful summary of plaintiff's underlying medical records (including records that were not otherwise

---

[15] To be sure, Dr. Mann was a specialist in the relevant field of orthopedics who conducted a comprehensive review of plaintiff's medical records – both factors which generally weigh in favor of crediting the opinion of a non-examining physician. *See* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."); *id.* §§ 404.1527(c)(6), 416.927(c)(6) ("we will also consider . . . the extent to which a medical source is familiar with the other information in your case record"). Dr. Mann's qualifications and thoroughness, however, did not permit the ALJ to rely on an opinion that he never offered.

before the ALJ), which properly informed her determination that plaintiff's back condition was not disabling during the relevant time period. (R. 28.) Because (as discussed below) substantial evidence in the record supported the ALJ's evaluation of plaintiff's symptoms and her RFC determination, even without Dr. Mann's opinions, the Court concludes that the ALJ's error in according his opinion "considerable" weight was harmless.[16]

## C.      The ALJ Did Not Err in Evaluating Plaintiff's Subjective Symptoms

The regulations provide a two-step process for evaluating a claimant's subjective assertions of pain and other symptoms:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain *alone* cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. *Id.*

*Genier*, 606 F.3d at 49.[17] In considering a claimant's symptoms of pain, an ALJ must also consider her daily activities; the "location, duration, frequency, and intensity" of her pain; any precipitating

---

[16] Plaintiff proposes another basis to question Dr. Mann's opinion: the fact that he completed his review at the behest of Personal Touch Holding Corp. (R. 1429), plaintiff's former employer (R. 304), "in the context of adversarial Workers Compensation proceedings." Pl. Mem. at 15 n.3 (citing *Lupo v. Comm'r of Soc. Sec.*, 2011 WL 1316105 *4 (E.D.N.Y. April 4, 2011)). The Court disagrees. "[I]t is always arguably in the 'self-interest' of the doctor to help the party who requested that he give an opinion." *See Diaz v. Shalala*, 59 F.3d 307, 314 n.9 (2d Cir. 1995). Absent any other evidence of bias, the mere fact that Dr. Mann conducted his review on behalf of plaintiff's former employer does not undermine the results of that review.

[17] Before March 28, 2016, the SSA referred to this analysis as an evaluation of a claimant's "credibility." In a Policy Interpretation Ruling applicable March 28, 2016, and republished October 25, 2017, the SSA "eliminat[ed] the use of the term 'credibility' from [its] sub-regulation policy," to clarify that its analysis under 20 C.F.R. §§ 404.1529 and 416.929 is "not an examination of an individual's character" but is instead a "subjective symptom evaluation." SSR 16-3p, 2017 WL 5180304, at *2 (S.S.A. Oct. 25, 2017). Notwithstanding the change in nomenclature, "the standard for evaluating subjective symptoms has not changed in the regulations." *Debra N. v. Comm'r of Soc. Sec.*, 2019 WL 1369358, at *7 n.9 (N.D.N.Y. Mar. 26, 2019).

or aggravating factors; the "type, dosage, effectiveness, and side effects of any medication" taken to alleviate the pain; "treatment" other than medication received by the claimant; any "measures" used by a claimant to relieve her pain or other symptoms; and any other factors concerning the claimant's "functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).

In this case, I perceive no error in the ALJ's evaluation of plaintiff's subjective symptoms. Consistent with the above regulatory factors, the ALJ considered plaintiff's relatively "conservative" treatment history, the effectiveness of her treatments, including non-narcotic medications, steroid injections, and physical therapy for her knee – and the medical determination not to perform surgery on plaintiff's back, due largely to the lack of evidence of "nerve impingement" at L2-L3. (R. 28.) Plaintiff correctly points out, *see* Pl. Mem. at 19, that some courts have found that steroid injections, coupled with far stronger pain medications than plaintiff ever required, cannot be deemed "conservative" treatment.[18] In this case, however, plaintiff received only four steroid injections over the course of the three-year period considered by the ALJ (R. 930, 940, 1397, 1410), and insofar as the record reflects, her pain medication consisted of over-the-counter analgesics (such as acetaminophen) and NSAIDs (such as ibuprofen, naproxen, and meloxicam). *See Burgess*, 537 F.3d at 129 ("the fact that a patient takes only over-the-counter medicine to alleviate her pain may, however, help to support the Commissioner's conclusion that the claimant is not disabled if that fact is accompanied by other substantial evidence in the record").

---

[18] *See*, *e.g.*, *Jacovino v. Berryhill*, 2017 WL 7118127, at *22 (S.D.N.Y. Dec. 22, 2017) (collecting cases), *report and recommendation adopted*, 2018 WL 587899 (S.D.N.Y. Jan. 26, 2018); *Jazina v. Berryhill*, 2017 WL 6453400, at *6 (D. Conn. Dec. 13, 2017) ("plaintiff's treatment regimen – which included powerful prescription opioids like oxycodone as well as other prescription drugs, and in the past included physical therapy and injections – does not appear to qualify as conservative").

Plaintiff repeatedly acknowledged that those medications were generally effective, at least for a time, in reducing or relieving her pain (R. 67, 600, 858, 874, 938), and, as discussed below, her treatment notes often reflected that she was independent in her activities of daily living. (R. 31, 875, 1344, 1358.)

An ALJ's evaluation of a social security claimant's subjective symptoms "is entitled to substantial deference by a reviewing court." *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 645 (S.D.N.Y. 2019) (Moses, M.J.), *appeal dismissed* (May 31, 2019). *See also Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) ("If the [ALJ's] findings are supported by substantial evidence . . . the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain."). In light of the substantial deference owed to the ALJ's determination on this point, the Court finds no error in the ALJ's evaluation of plaintiff's subjective symptoms.

### D. Substantial Evidence Supported the ALJ's RFC Determination

As noted above, a claimant's RFC is the most she can do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* SSR 96-8p, 1996 WL 374184, at *4 (S.S.A. July 2, 1996). The ALJ must assess the claimant's RFC based on all the relevant medical and other evidence of record, taking into consideration the limiting effects of all the claimant's impairments. *See* SSR 96-8p, 1996 WL 374184, at *2, 5.

In this case, the ALJ found that plaintiff had the RFC to perform work at the "light" exertional level,[19] as she had while working as a babysitter in 2015; that is, "to lift and carry 10

---

[19] *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or

pounds frequently and 20 pounds occasionally; sit for about 6 hours of an 8-hour workday"; and "stand and/or walk about 6 hours in an 8-hour workday." (R. 27.)[20] Plaintiff argues that this RFC is unsupported by any medical authority in the record, by plaintiff's activities of daily living, or by "any *specific* medical evidence or even persuasive non-medical evidence that establishes the light RFC." Pl. Mem. at 14-16 (emphasis in original).

The Court cannot agree. To be sure, both Dr. Burducea and Dr. Egbuna opined that plaintiff's ability to stand and walk was limited to a greater degree than the ALJ accepted.[21] However, the only other medical opinion in the record concerning plaintiff's functional capacity was the opinion of Dr. Mescon, whose physical examination yielded entirely normal results and who concluded that plaintiff had *no* exertional or postural limitations. (R. 600-03.) The ALJ gave "little" weight to all three of these examining physicians and ultimately determined – after appropriately considering all of the evidence in the record, including non-opinion medical evidence, plaintiff's own testimony, and other non-medical evidence – that plaintiff's RFC fell somewhere between the "no functional limitations" identified by Dr. Mescon and the "extreme limitations" offered by Dr. Burducea. (R. 29-30.)

"[I]t is the ALJ's prerogative to make an RFC assessment after weighing the evidence and the District Court may not reverse provided there is substantial evidence in the record to support her findings." *Mitchell v. Astrue*, 2010 WL 3070094, at *5 (W.D.N.Y. Aug. 4, 2010). In this case,

_____

standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.").

[20] The ALJ also found that plaintiff had certain postural limitations that prevented her from performing the full range of exertionally "light" work: she "is precluded from climbing ladders, ropes, and scaffolds; is limited to occasionally climbing of ramps and stairs; and is limited to occasional balancing, stooping, kneeling, crouching, and crawling." (R. 27.)

[21] The Court notes, however, that Dr. Egbuna's opinion that plaintiff could sit for four hours *without interruption* (R. 1101) appears to be consistent with the ALJ's RFC.

there is substantial evidence to support the ALJ's determination. Importantly, as the Commissioner notes, plaintiff "engaged in substantial gainful activity for six months in 2015, which was after her alleged onset date of April 11, 2014." Def. Mem. at 17. (*See also* R. 24, 66.) While this is not determinative of her capacity for work in 2016 or 2017, it is relevant to assessing her reported symptoms, including (for example) the claim in her June 11, 2014 Function Report that she could "no longer lift more than 5 pounds" or carry a gallon of milk, could "no longer stand for more than 5 minutes," and could not "sit in one position for more than 20 minutes." (R. 334-35.)[22] Moreover, there is no indication in the record that plaintiff's impairments caused her to stop that work, and no evidence that her condition materially deteriorated, or that she developed new impairments, thereafter.

Moreover, plaintiff reported to her doctors in August 2014 that she "walked frequently during waking hours." (R. 1001.) Two years later, on April 28, June 16, and July 5, 2016, physical therapist Vanegas wrote that plaintiff's "mild" knee pain "increased with long distance walking" or "long walks." (R. 1078, 1318, 1375.) Additionally, plaintiff was repeatedly noted to have "complete independence," "modified independen[ce]," or no restriction at all in her activities of daily living. (R. 31, 875, 1267, 1318, 1344, 1358.)

The ALJ also noted, appropriately, that every examining physician who saw plaintiff for a purpose other than workers' compensation consistently reported little or no objective findings that would indicate significant functional limitations. On April 22, 2014, Dr. Flores observed limited flexion and extension in plaintiff's back but noted a "normal motor and sensory exam." (R. 575.) On August 28, 2014, Dr. Mescon's internal medicine examination was entirely normal. (R. 600-

---

[22] At the 2016 hearing, plaintiff again stated that she could not lift a gallon of milk. (R. 71.) However, she estimated that she could walk for twenty minutes at a time, stand for ten to fifteen minutes at a time, and sit for fifteen to thirty minutes at a time. (R. 69-71.)

03.) On March 26, 2015, Dr. Egbuna noted that plaintiff had a normal joint range of motion and a normal motor and sensory exam. (R. 922.) On January 20, 2016, Dr. Denton's orthopedic examination revealed "no muscle spasm upon palpation," normal ranges of motion, and a negative straight leg raise test, and his "[n]eurological examination of the bilateral lower extremities" revealed "no atrophy," "[m]uscle strength in each range [] at +5/5," and "[s]ensation to light touch [] within normal limits." (R. 1433.) On June 23, 2016, Dr. Chiaramonte's orthopedic examination revealed paraspinal spasm upon palpation in plaintiff's thoracic spine and limited flexion in her lumbar spine, but otherwise yielded entirely normal results. (R. 1435.)

To be sure, plaintiff's physicians at Rehabilitation Medicine reported more significant objective findings from their examinations. For instance, they consistently reported that plaintiff had muscle spasms and tenderness in her back, as well as positive straight leg raise tests. (*See, e.g.*, 863-64, 938, 1393.) Such "[g]enuine conflicts in the medical evidence," however, "are for the Commissioner to resolve." *Veino*, 312 F.3d at 588.

Plaintiff has informed the Court that she filed a subsequent application for benefits and that the SSA found her disabled as of June 23, 2017 – the day after the ALJ's adverse Decision in this case. *See* Pl. Mem. Ex. A. That fact does not undermine the ALJ's determination. First, plaintiff's subsequent application related to a different time period than the one considered by the ALJ here. *See Michael M. v. Comm'r of Soc. Sec.,* 2019 WL 530801, at *2 n.3 (N.D.N.Y. Feb. 11, 2019) (upholding an ALJ's denial of benefits notwithstanding the SSA's subsequent approval of benefits for the same claimant as to a later period). Second, as noted above, "the Court must affirm the decision of the [Commissioner] even if there is also substantial evidence for plaintiff's position." *Gernavage*, 882 F. Supp. at 1417 n.2. *See also D'Amato v. Apfel*, 2001 WL 776945, at *7 (S.D.N.Y. July 10, 2001) ("the ALJ's findings will be affirmed as long as they are supported by

substantial evidence even if there is substantial evidence for Plaintiff's position"), *aff'd sub nom.*

*D'Amato v. Barnhart*, 43 F. App'x 415 (2d Cir. 2002).

## VI.    CONCLUSION

For the foregoing reasons, the plaintiff's motion is DENIED, the Commissioner's motion

is GRANTED, and the case is DISMISSED.

Dated:  New York, New York
        September 30, 2019

                                        **SO ORDERED.**

                                        _____
                                        **BARBARA MOSES**
                                        **United States Magistrate Judge**